MINO v CLIO SCHOOL DISTRICT

Docket No. 232279. Submitted November 13, 2002, at Detroit. Decided January 14, 2003, at 9:25 A.M. Leave to appeal sought.

Dr. Keith E. Mino, Jr., and Nancy S. Mino brought an action in the Genesee Circuit Court against the Clio School District and others after Dr. Mino's employment as superintendent of the school district was terminated pursuant to a severance agreement and after he was not hired by the Pocatello, Idaho, Board of Education as superintendent following a visit by a Pocatello search committee in Clio. The severance agreement had provided that,"[u]nless required by law to do so, the Clio Area Schools will not disseminate negative information about Dr. Mino to any person or organization inside or outside of the Clio Area Schools." In their complaint, the plaintiffs alleged breach of contract by assistant superintendent Fay Latture and school board member Jolene Peacock with respect to their remarks about Dr. Mino in conversations with the Pocatello search committee, defamation by Bruce Fairweather and other Clio principals regarding a letter to the editor of local newspapers they wrote in support of the school board's action to terminate Dr. Mino's employment, defamation by school board public relations director Wanda Emmerling in a memorandum she wrote to a union representative, defamation by Peacock in a letter she wrote to school district employees and in statements Peacock made to the Pocatello search committee, tortious interference by Latture and Peacock with Dr. Mino's business expectancy in the form of employment by the Pocatello schools, intentional infliction of emotional distress by Latture, Peacock, and Emmerling, and loss of consortium by Mrs. Mino. The court, Judith A. Fullerton, J., granted summary disposition for the defendants with respect to all claims. The plaintiffs appealed.

The Court of Appeals held:

1. The trial court did not err in summarily dismissing the breach of contract claim. MCL 380.1230b(6) provides in part that the board or an official of a school district shall not enter into a severance agreement that has the effect of suppressing information about unprofessional conduct of an employee or former employee, and that any provision of a contract or agreement that is contrary to

subsection 1230b(6) is void and unenforceable. MCL 380.1230b(8)(b) defines "unprofessional conduct" to mean one or more acts of misconduct; one or more acts of immorality, moral turpitude, or inappropriate behavior involving a minor; or commission of a crime involving a minor. "Negative information," as used in the confidentiality clause of the severance agreement in this case, encompasses unprofessional conduct. Because the statute precludes entering into an agreement providing what the confidentiality clause in this case states, the clause is void and unenforceable as a matter of law.

2. The trial court did not err in summarily dismissing the defamation claims. Because Dr. Mino was a public figure, the plaintiffs had to establish actual malice to maintain the defamation claims. Clear and convincing evidence of actual malice, i.e., that the defendants made the alleged defamatory statements with knowledge that they were false or in reckless disregard for the truth, was lacking with respect to the alleged defamatory statements. Additionally, with respect to Peacock, her letter made no reference to Dr. Mino in stating why she voted against a contract with the union.

3. The trial court did not err in summarily dismissing the claim of tortious interference with a business relationship or expectancy. Latture and Peacock did not instigate the Pocatello search committee's investigation. The evidence provided by the plaintiffs failed to demonstrate any affirmative acts by Latture or Peacock done with malice or without justification.

4. The trial court did not err in summarily dismissing the claim of intentional infliction of emotional distress. The conduct of Latture, Peacock, and Emmerling cannot be described as extreme or outrageous.

5. The trial court did not err in summarily dismissing the claim of loss of consortium. A derivative claim of loss of consortium stands or falls with the primary claims in the complaint.

Affirmed.

WHITE, J., concurring in part and dismissing in part, disagreed that the severance agreement violates MCL 380.1230b, and would remand regarding the claim of breach of contract. The plaintiffs alleged that agents of defendant school district disseminated negative information that would not fall within the statutory definition of "unprofessional conduct." Also, because the plaintiffs, at oral argument, withdrew their defamation claims relating to the Clio principals and to Peacock's letter regarding the union contract, Judge WHITE does not join the portions of the majority opinion that address the withdrawn claims. Judge WHITE concurred with the majority with respect to the rest of the plaintiffs' claims.

1. SCHOOLS — SEVERANCE AGREEMENTS — CONFIDENTIALITY CLAUSES.

 The board or an official of a school district may not enter into a severance agreement with an employee that has the effect of suppressing information about unprofessional conduct by the employee; any such agreement is void and unenforceable (MCL 380.1230b[6]).

2. LIBEL AND SLANDER — ACTIONS — PUBLIC FIGURES.

 A plaintiff establishes a defamation claim regarding a statement by showing a false and defamatory statement concerning the plaintiff, an unprivileged publication to a third party, fault amounting at least to negligence on the part of the publisher, and either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod); where the plaintiff is a public figure, the plaintiff must prove by clear and convincing evidence that the publication was a defamatory falsehood and was made with actual malice, i.e., with knowledge of falsity or with reckless disregard for the truth.

3. TORTS — INTERFERENCE WITH BUSINESS RELATIONSHIP OR EXPECTANCY.

 The elements of tortious interference with a business relationship or expectancy are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff; to establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference; where the defendant's actions were motivated by legitimate business reasons, the defendant's actions would not constitute improper motive or interference.

4. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

 A plaintiff in an action for intentional infliction of emotional distress must establish extreme and outrageous conduct, intent or recklessness, causation, and severe emotional distress; liability for intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

*Charters, Heck, O'Donnell, Petrulis & Zorza, P.C.* (by *Michael A. Heck*), for the plaintiffs.

*Cox, Hodgman & Giarmarco, P.C.* (by *Timothy J. Mullins* and *Stephen R. Estey*), for the defendants.

Before: O'CONNELL, P.J., and WHITE and B. B. MACKENZIE*, JJ.

O'CONNELL, P.J. Plaintiffs Keith E. Mino, Jr.,[1] and Nancy S. Mino appeal as of right the circuit court's order granting summary disposition pursuant to MCR 2.116(C)(10)[2] in favor of defendants.[3]

I. THE ISSUE

This case presents a question of first impression in this state regarding the legality of a confidentiality clause in an employment severance agreement that essentially prohibits the parties from disparaging each other after the employment relationship terminates.

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

[1] We will refer to Keith as "Dr. Mino."

[2] Although defendants brought their motion for summary disposition pursuant to MCR 2.116(C)(8) and (10), the parties and the circuit court relied on documentary evidence beyond the pleadings. In this situation, we treat the motion as having been granted pursuant to MCR 2.116(C)(10), and we examine both the pleadings and additional documents. *Kefgen v Davidson*, 241 Mich App 611, 616; 617 NW2d 351 (2000). In addition, the circuit court determined that Dr. Mino agreed to a release of claims that he had before the parties signed the severance agreement. We note that the issue on appeal is whether there were material issues of fact that preclude summary disposition and not whether there was an effective release.

[3] When this cause of action accrued, defendants were Clio School District; assistant superintendent Fay Latture; school board members Sally VanRoeyen and Jolene Peacock; school board public relations director Wanda Emmerling; and school principals Bruce Fairweather, Ron Maygar, Judith Barrett, Vern Kamp, and Rich Lutgens.

In light of MCL 380.1230b(6), which prohibits a school district or board from "enter[ing] into . . . any . . . contract or agreement that has the effect of suppressing information about unprofessional conduct of an employee or former employee," we hold that an employment confidentiality clause of this nature is void and unenforceable. We also hold that plaintiffs cannot sustain their noncontractual claims. Therefore, we affirm the circuit court's order granting summary disposition to defendants.

## II. BASIC FACTS AND PROCEEDINGS

Dr. Mino began his employment as superintendent of the Clio School District during the last week of June 1997. In September 1997, problems developed in Dr. Mino's performance as superintendent. Superintendent secretary Diane Schaupp felt that Dr. Mino did not take charge of the position because he did not attempt to meet with staff and did not attend organizational meetings. She also testified that Dr. Mino received excessive telephone calls from his former place of employment. In addition, Schaupp observed Dr. Mino speak loudly and angrily with public relations director Wanda Emmerling regarding a district publication and heard Dr. Mino say he could fire her despite the fact that her husband was a school board member.

In addition, there were difficulties between Dr. Mino and assistant superintendent Fay Latture. According to Schaupp, Latture had to assume extra duties that Dr. Mino was supposed to perform. Latture informed her secretary that Dr. Mino was having an extramarital affair and that Dr. Mino made sexual telephone calls. In 1997 and 1998, Latture also

informed the district payroll clerk that Dr. Mino inappropriately touched local waitresses. In January 1998, Latture filed a formal oral complaint against Dr. Mino with the school district personnel committee. Latture reiterated her concerns, which Dr. Mino denied. Other concerns voiced at the personnel committee meeting included Dr. Mino's leadership, lack of visibility, and his negotiations with the union.

In January 1998, Dr. Mino decided to look for work outside the school district. In April 1999, Dr. Mino and the district entered into a "letter of understanding" establishing a severance agreement. It stated, in part: "Unless *required by law* to do so, the Clio Area Schools will not disseminate negative information about Dr. Mino to any person or organization inside or outside of the Clio Area Schools." (Emphasis in original.) The severance agreement also included a release of claims against both parties, and effected a "buyout" of Dr. Mino's three-year contract.[4]

After fielding other job inquiries, in May 1999, Dr. Mino went to Pocatello, Idaho, to interview for a superintendent position. The Pocatello Board of Education appointed four people to a search committee to go to Michigan in order to investigate Dr. Mino. One committee member testified that board members at Dr. Mino's former place of employment said that

---

[4] After Dr. Mino's contract was bought out, the defendants who were school principals wrote a letter to the editor of local newspapers about the matter. Lutgens testified that the letter was not a comment on Dr. Mino's performance, but to assuage the community's concerns that the situation was not properly handled. Dr. Mino alleged that the following excerpt of the letter was defamatory: "Contrary to some perceptions, the concerns over the leadership being provided by Dr. Mino came from many people and much of the information gathered by the board was received in confidence."

they would not hire Dr. Mino again. Many of the committee members testified that, at first, Clio employees did not say anything negative about Dr. Mino. However, committee member Gwendalyn C. Lloyd testified that Jolene Peacock eventually told her that they might hear rumors about inappropriate touching involving Dr. Mino, and that there was an agreement not to provide any negative information about Dr. Mino. Nonetheless, Lloyd testified that some of the committee members were told not to believe the rumors. Peacock also informed some of the committee members that there were community concerns about Dr. Mino's leadership style, his management of the budget, and unsubstantiated rumors that he engaged in sexual improprieties, but she stated that these views were not her personal views.

Pocatello trustee J. Thomas Bernasek testified that during a special meeting with the school board, the search committee informed the board of the rumors they heard, but stated that the rumors were unsubstantiated and maintained that they did not recommend Dr. Mino because of his leadership style only. Bernasek stated that the school board did not want to hire a superintendent "with that type of baggage" regardless of its truth, noting that the Pocatello School District already had its own problems with public perception. On June 2, 1999, the Pocatello School District informed Dr. Mino that he was not being offered the superintendent position.[5]

---

[5] On June 9, 1999, Emmerling wrote a memo to the union representative and distributed it to the district regarding the representative's previous statements about Emmerling. Plaintiffs alleged it was defamatory because Emmerling noted in the letter that Dr. Mino had yelled at her and threatened to fire her.

In October 1999, plaintiffs filed their eleven-count complaint.[6] Following defendants' motion for summary disposition, the circuit court granted the motion, finding that the release—which expressly prohibited claims the parties had before the severance agreement was signed—precluded most of plaintiffs' claims. The court also found that there were no genuine issues of material fact on the remainder of plaintiffs' claims.

### III. BREACH OF CONTRACT

A trial court's grant or denial of summary disposition under MCR 2.116(C)(10) is reviewed de novo on appeal. *Liberty Mut Ins Co v Michigan Catastrophic Claims Ass'n*, 248 Mich App 35, 40; 638 NW2d 155 (2001). A motion for summary disposition tests whether there is factual support for a claim. *Universal Underwriters Group v Allstate Ins Co*, 246 Mich App 713, 720; 635 NW2d 52 (2001). Affidavits, pleadings, depositions, admissions, and documentary evidence are considered in reviewing a motion for summary disposition pursuant to MCR 2.116(C)(10), and the evidence is viewed " 'in the light most favorable

---

Finally, on June 10, Peacock wrote a letter to school district employees regarding their collective bargaining agreement's lack of a provision for administrative leave for professional development purposes. Plaintiffs also alleged that this letter was defamatory because Peacock's letter stated that Dr. Mino should have negotiated for professional development days.

[6] Plaintiffs assert on appeal that the conspiracy claim and all claims brought against VanRoeyen were properly dismissed. Furthermore, at oral argument, plaintiffs noted their withdrawal of claims for one of two counts of defamation against Peacock (for her letter regarding the union contract); the defamation claim against principals Fairweather, Barrett, Kamp, Maygar, and Lutgens (regarding their letter to the editor); and the defamation, intentional infliction of emotional distress, and tortious interference claims against the school district.

to the party opposing the motion.' " *Universal Under-writers, supra* at 720, quoting *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). Summary disposition is proper under MCR 2.116(C)(10) if the documentary evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Universal Underwriters, supra* at 720.

On appeal, plaintiffs allege breach of contract against Latture and Peacock (involving her conversation with the Pocatello search committee) for "disseminat[ing] negative information about Dr. Mino[.]"[7] Plaintiffs point to the following instances: (1) Lloyd's testimony that Peacock raised concerns about leadership style and how the money was being managed for the school district; (2) Lloyd's testimony that Peacock told her there were unsubstantiated or alleged rumors that Dr. Mino engaged in sexual improprieties; (3) Lloyd's testimony that Peacock could not give the committee her personal view because a "gag order" was in place; (4) Lloyd's testimony that Latture stated that her leadership style was almost the exact opposite of Dr. Mino's leadership style in that she was "hands on," interested in minute detail, and interested in complying with stated standards; and (5) Clio School District trustee David Hemingway's testimony that a committee member indicated that Latture informed them of the "buy out, the gag order," and

---

[7] Plaintiffs' breach of contract argument on appeal does not address the remaining defendants' conduct. Thus, we will only discuss Peacock's and Latture's conduct regarding breach of contract. See MCR 7.212(C)(5). In any event, because we hold that the confidentiality clause was void and unenforceable as a matter of law, the rest of plaintiffs' original claims within the breach of contract issue were also properly dismissed by summary disposition.

sexual improprieties involving Dr. Mino. In this case, the circuit court found no evidence of a breach of contract, noting that there was no conduct authorized by the Clio Board of Education. The circuit court further determined that, even if it were able to find such conduct or communications, MCL 380.1230b(6) vitiated such a claim. We agree with the circuit court.

The primary goal of statutory interpretation is to give effect to the intent of the Legislature. *Lamp v Reynolds*, 249 Mich App 591, 597; 645 NW2d 311 (2002), citing *In re Messer Trust*, 457 Mich 371, 379-380; 579 NW2d 73 (1998). To determine legislative intent, a reviewing court must first look to the statutory language. *Lamp, supra* at 597, citing *Charboneau v Beverly Enterprises, Inc*, 244 Mich App 33, 40; 625 NW2d 75 (2000). Statutory language should be construed reasonably, keeping in mind the purpose of the act. *Draprop Corp v Ann Arbor*, 247 Mich App 410, 415; 636 NW2d 787 (2001). Accordingly, "[i]f the plain and ordinary meaning of the statute's language is clear, judicial construction is inappropriate." *Lamp, supra* at 597.

MCL 380.1230b provides, in relevant part:

> (6) The board or an official of a school district, local act school district, public school academy, intermediate school district, or nonpublic school shall not enter into a collective bargaining agreement, individual employment contract, resignation agreement, severance agreement, or any other contract or agreement that has the effect of suppressing information about unprofessional conduct of an employee or former employee or of expunging information about that unprofessional conduct from personnel records. *Any provision of a contract or agreement that is contrary to this subsection is void and unenforceable.* This subsection does not restrict the expungement from a personnel file of infor-

mation about alleged unprofessional conduct that has not
been substantiated.

*    *    *

(8) As used in this section:

*    *    *

(b) "Unprofessional conduct" means 1 or more acts of
misconduct; 1 or more acts of immorality, moral turpitude,
or inappropriate behavior involving a minor; or commission
of a crime involving a minor. A criminal conviction is not an
essential element of determining whether or not a particu-
lar act constitutes unprofessional conduct. [Emphasis
added.]

The confidentiality clause in the contract in question
states:

7. Unless *required by law* to do so, the Clio Area Schools
will not disseminate negative information about Dr. Mino to
any person or organization inside or outside of the Clio
Area Schools. Unless *required by law* to do so, Dr. Mino
will not disseminate negative information about the Clio
Area Schools . . . . [Emphasis in original.]

In the context of employment actions, our Supreme
Court has defined "misconduct" in the following
manner:

"The term 'misconduct' . . . is limited to conduct evincing
such willful or wanton disregard of an employer's interests
as is found in deliberate violations or disregard of standards
of behavior which the employer has the right to expect of
his employee, or in carelessness or negligence of such
degree or recurrence as to manifest equal culpability,
wrongful intent or evil design, or to show an intentional and
substantial disregard of the employer's interests or of the
employee's duties and obligations to his employer." [*Carter
v Employment Security Comm*, 364 Mich 538, 541; 111

NW2d 817 (1961) (unemployment action), quoting *Boynton Cab Co v Neubeck*, 237 Wis 249, 259-260; 296 NW 636 (1941).]

It is clear that the contractual phrase "negative information" generally encompasses the statutory phrase "unprofessional conduct." See *Random House Webster's College Dictionary* (2000) (definition of "negative"); *Lamp, supra* at 597 (statute's plain language controls). The confidentiality clause in the severance agreement precludes the "dissemination of negative information" about Dr. Mino except in circumstances "required by law . . . ." MCL 380.1230b precludes a school district or board from entering into a severance agreement that "has the effect of suppressing information about unprofessional conduct of an employee or former employee . . . ." Because the statute precludes entering into an agreement providing exactly what the confidentiality clause states in this case, we hold that the clause is void and unenforceable as a matter of law. *Id.*; see also *American Trust Co v Michigan Trust Co*, 263 Mich 337, 339; 248 NW 829 (1933) (a contract in violation of statute is an illegal contract and is void). Consequently, plaintiffs cannot maintain a breach of contract action based on this confidentiality clause.[8] See *id.*

---

[8] Even if we were to hold this confidentiality clause enforceable, in light of this statute, it would be rendered meaningless because of its terms barring this clause "except as required by law." Cf. *Hoste v Shanty Creek Mgt, Inc*, 459 Mich 561, 574; 592 NW2d 360 (1999) (a court should avoid a construction that renders any part of a statute nugatory).

### IV. DEFAMATION[9]

On this claim, the circuit court determined that it was impossible to conclude from the record that anyone made alleged defamatory statements and that there was no evidence of actual malice. In addition to citing the release of claims provision, the circuit court found that there was a qualified privilege to speak in meetings. Regarding the statements made to the Pocatello search committee after the severance agreement was signed, the circuit court determined that they were insubstantial.

"A communication is defamatory if, under all of the circumstances, it tends to so harm the reputation of an individual that it lowers the individual's reputation in the community or it deters others from associating or dealing with the individual." *Kefgen v Davidson*, 241 Mich App 611, 617; 617 NW2d 351 (2000). In order to establish a claim of defamation, a plaintiff must show: (1) a false or defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication (defamation per quod). *Id.* "When addressing a defamation claim, a reviewing court is required to make an independent examination of the record to ensure against forbidden intrusions into the field of free expression." *Id.*

---

[9] Plaintiffs have not raised on appeal the defamation claim against Latture as it relates to the claim that Latture made defamatory statements about Dr. Mino to the Pocatello search committee. Instead, plaintiffs seem to rely on their breach of contract claim with regard to these comments.

Because Dr. Mino is a public figure, he "must prove by clear and convincing evidence that the publication was a defamatory falsehood and that it was made with actual malice through knowledge of its falsity or through reckless disregard for the truth." *Id.* at 624. " 'Actual malice is defined as knowledge that the published statement was false or as reckless disregard as to whether the statement was false . . . . [I]ll will, spite, or even hatred, standing alone, do not amount to actual malice.' " *Ireland v Edwards*, 230 Mich App 607, 622; 584 NW2d 632 (1998), quoting *Grebner v Runyon*, 132 Mich App 327, 332-333; 347 NW2d 741 (1984) (citations omitted). Whether actual malice exists is a question of law that must be determined by clear and convincing evidence. *Kefgen, supra* at 624-625. We will address each group of defendants in turn.

A. PLAINTIFFS' DEFAMATION CLAIM AGAINST THE CLIO PRINCIPALS

We disagree with plaintiffs' contention that there are genuine issues of material fact that preclude summary disposition of the defamation claim against Clio principals Bruce Fairweather, Judith Barrett, Vern Kamp, Ron Maygar, and Rich Lutgens. Plaintiffs have failed to meet their burden to demonstrate by clear and convincing evidence that the statement made in the principals' letter was a defamatory falsehood and that it was made with actual malice through knowledge of its falsity or through reckless disregard for the truth. *Id.* at 624. First, there is no evidence that the statement was false or defamatory because it is unlikely that the challenged statement alone would harm Dr. Mino's reputation in the community or deter others from associating or dealing with him. See *id.*

at 617. The paragraph from which the statement came reads:

> We would like to state, for the record, that we feel that every member of the board of education was committed to gathering all of the information he or she could, and agonized over finding the best solution for the good of the community and Clio students. There were no easy choices, and the solution arrived at was probably the best of several tough alternatives. Contrary to some perceptions, the concerns over the leadership being provided by Dr. Mino came from many people and much of the information gathered by the board was received in confidence.

When read in context, the paragraph confirms the principals' testimony that the letter was written to support the actions of the school board rather than to attack Dr. Mino's leadership qualities. Second, even if the statement was false or defamatory, plaintiffs have failed to show by clear and convincing evidence that the statement was made with actual malice. *Id.* Plaintiffs present no evidence that the principals made up the statement. Further, plaintiffs have demonstrated nothing more than insufficient investigation of the statement by some of the principals, and this Court in *Ireland, supra* at 622, specifically stated insufficient investigation does not establish reckless disregard. Accordingly, the circuit court properly granted defendants' motion for summary disposition regarding this claim.

### B. PLAINTIFFS' DEFAMATION CLAIM AGAINST EMMERLING

Plaintiffs contend that school board public relations director Emmerling defamed Dr. Mino by circulating a memorandum she wrote to a union representative in which she attacked Dr. Mino's leadership

style by stating that he called her into his office, screamed and yelled at her, and that he threatened to fire her several times. Plaintiffs contend that Emmerling's assertions are not true and that there is an issue of fact regarding whether Emmerling was fabricating the story. Specifically, plaintiffs alleged in their complaint that the following sentence was false or defamatory: "As you know, the real reason I came to see you was to ask if it was or was not true that you had said things about me in my job; things that Keith Mino had referenced when he had called me into his office, screaming at me and threatening to fire me, then pressuring me as to why members of my family, including my daughter, don't support him, then threatening to fire me again." We disagree with plaintiffs' position on this issue.

In our view, plaintiffs have failed to demonstrate actual malice by clear and convincing evidence. At the outset, we note that there is some support for Emmerling's assertion. See *id.* at 616, 617. Schaupp testified that during the incident, she told Emmerling that Dr. Mino stated about her, "I don't care if her husband is a member of the board of education, I could fire her right now." Schaupp also testified that Dr. Mino initially spoke to Emmerling in a loud manner and Dr. Mino was angry. Plaintiffs merely contend that there is a question of fact whether Emmerling fabricated the story, which is tantamount to a reckless disregard for the truth. "Reckless disregard for truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation." *Id.* at 622 (quotation omitted). Further, reckless disregard is measured by whether the publisher entertained serious doubts con-

cerning the truth of the statements published. *Id.*
Thus, plaintiffs' general allegations of malice are
insufficient to create a genuine issue of fact regarding
whether Emmerling published the statement with
actual malice. See also *Kefgen, supra* at 624.

### C. PLAINTIFFS' DEFAMATION CLAIM AGAINST PEACOCK

Plaintiffs state that Peacock published a document
following the signing of the severance agreement that
made unfounded allegations where it was clear from
the context of the letter that she was referring to Dr.
Mino. Finally, plaintiffs contend that Peacock made
defamatory statements to the Pocatello search com-
mittee. We also disagree with these claims.

The challenged June 10, 1999, letter—addressed to
the employees of the Clio schools—reads in relevant
part:

> I am writing this letter to address some of the rumors
> that are circulating around the district. I am very disheart-
> ened that some people in leadership positions would spread
> such rumors. . . .
>
> First, I am pro-education. . . . The problem I do have with
> (and the *only* reason I voted against) the contract with the
> [union] is that I believe it is [sic] violation of the law.
> According to the State Director of School Improvement and
> Accountability Programs, Barb Knutson, and the GISD Staff
> Development Coordinator, Traci Valentine, the Revised
> School Code states that the school district *shall* provide 2
> days of professional development in 1998-99, 3 days in 1999-
> 2000, 4 days in 2000-01, and 5 days in each of 2001-2008.
> Call the ISD. We do not have these provisions and are in
> violation. I brought this up at several executive session dis-
> cussions of negotiations but was repeatedly told that it was
> ok because there was no one to check up on us so it
> wouldn't matter. I do not believe this is the right thing to

teach our students, nor is it the right thing for our staff! [Emphasis in original.][10]

The circuit court properly granted defendants' motion for summary disposition with respect to this issue. The letter does not concern Dr. Mino and makes no reference to Dr. Mino. The letter clearly addresses Peacock's position regarding why she voted against a contract with the union and her belief that the contract did not contain a provision for certain development days. Further, even if the statements were defamatory, plaintiffs have failed to show actual malice by clear and convincing evidence. See *Ireland, supra* at 622. Accordingly, the circuit court did not err in granting defendants' motion for summary disposition with respect to this claim either.

Moreover, regarding plaintiffs' claim that Peacock made defamatory statements to the Pocatello search committee, plaintiffs were unable to show this by clear and convincing evidence. Lloyd testified that Peacock voiced her concerns over Dr. Mino's leadership style and the management of the school budget. In order for a statement to be actionable, the statement must be provable as false. *Id.* at 616, 617. These statements were subjective opinions and are not provable as false. *Id.* Regarding Peacock's statements about rumors concerning sexual improprieties, plaintiffs do not deny that there were certain rumors about Dr. Mino. Thus, plaintiffs have failed to demonstrate that Peacock's statements were defamatory falsehoods and that the statements were made with actual malice through knowledge of their falsity or through

---

[10] Plaintiffs alleged that the defamatory portion was the last part of the paragraph beginning with the phrase "The problem I do have . . . ."

a reckless disregard for the truth. See *Kefgen, supra* at 624.

### V. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP OR EXPECTANCY

Plaintiffs claim that Dr. Mino had the expectancy of obtaining employment as the superintendent of the Pocatello School District, that Latture and Peacock were aware of that expectancy, that Latture and Peacock intentionally provided negative information about Dr. Mino to the Pocatello search committee, and that Dr. Mino did not obtain employment with the Pocatello School District. We disagree.

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference. [*BPS Clinical Laboratories v Blue Cross & Blue Shield of Michigan*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996) (citations omitted).]

We have determined that the circuit court properly granted summary disposition of plaintiffs' claims of tortious interference with a business relationship or expectancy. The record demonstrates that it was the Pocatello search committee that conducted an investigation of Dr. Mino. Latture and Peacock did not instigate this investigation. Further, the evidence pro-

vided by plaintiffs fails to demonstrate any affirmative acts done with malice and without justification. See *id.* The only evidence plaintiffs point to was the testimony that Peacock said there were unsubstantiated rumors or allegations that Dr. Mino engaged in sexual improprieties, and the testimony that the Pocatello search committee said Latture told the committee about the "buyout, the gag order," and sexual improprieties involving Dr. Mino. Such evidence is insufficient in terms of demonstrating an affirmative act by Latture or Peacock done with malice or without justification. *Id.* Accordingly, the circuit court properly granted summary disposition of plaintiffs' claims for tortious interference with a business relationship or expectancy.

## VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs argue that, by spreading scandalous falsehoods and rumors about Dr. Mino, Latture, Peacock, and Emmerling engaged in conduct that was outrageous, at least reckless if not intentional, and caused Dr. Mino to suffer emotional harm, including depression. Again, we disagree.

In order to establish a valid claim of intentional infliction of emotional distress, a plaintiff must show:

"(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham v Ford*, 237 Mich App 670, 674; 604 NW2d 713 (1999). The *Graham* Court further stated:

Liability . . . has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intol-

erable in a civilized community. . . . It is not enough that the
defendant has acted with an intent that is tortious or even
criminal, . . . or even that his conduct has been character-
ized by "malice," or a degree of aggravation that would enti-
tle the plaintiff to punitive damages for another tort. . . .
The test is whether . . . an average member of the commu-
nity would . . . claim, "Outrageous!" [*Id.* at 674-675 (cita-
tions and quotations omitted).]

The circuit court also properly granted defendants'
motion for summary disposition with regard to plain-
tiffs' claims for intentional infliction of emotional dis-
tress against these defendants. The challenged con-
duct, which plaintiffs have failed to specify either in
their complaint or on appeal, cannot be described as
extreme or outrageous. "Liability does not extend to
mere insults, indignities, threats, annoyances, petty
oppressions, or other trivialities." *Id.* at 674. Accord-
ingly, we find no error here either.

### VII. LOSS OF CONSORTIUM

In *Long v Chelsea Community Hosp*, 219 Mich
App 578, 589; 557 NW2d 157 (1996), this Court held
that "[a] derivative claim for loss of consortium
stands or falls with the primary claims in the com-
plaint. Because plaintiff's other claims failed, the loss
of consortium claim must likewise fail." Likewise, in
the instant case, Nancy's claim for loss of consortium
must also fail in all respects.[11]

Affirmed.

B. B. MACKENZIE, J., concurred.

---

[11] Given our disposition of this case, it is unnecessary for us to examine
plaintiffs' claim that governmental immunity does not apply in this case.

WHITE, J. (*concurring in part and dissenting in part*). I do not agree that the instant contract violates MCL 380.1230b, and would remand regarding the breach of contract claim. The contract provided: "Unless *required by law* to do so, the Clio Area Schools will not disseminate negative information about Dr. Mino to any person or organization inside or outside of the Clio Area Schools." The statute prohibits entering into a contract that has the effect of suppressing information about unprofessional conduct or of expunging information about that unprofessional conduct from personnel records. "Unprofessional conduct" is defined by the statute:

> "Unprofessional conduct" means 1 or more acts of misconduct; 1 or more acts of immorality, moral turpitude, or inappropriate behavior involving a minor; or commission of a crime involving a minor. A criminal conviction is not an essential element of determining whether or not a particular act constitutes unprofessional conduct.

The majority states that it is clear that the contractual phrase "negative information" generally encompasses the statutory phrase "unprofessional conduct." However, "unprofessional conduct" is defined by statute and encompasses a much narrower range of conduct than is defined by "negative information." Plaintiffs allege that defendant school district's agents disseminated negative information that would not fall within the statutory definition of "unprofessional conduct," including the definition of "misconduct" found in *Carter v Employment Security Comm*, 364 Mich 538, 541; 111 NW2d 817 (1961), e.g., information about Dr. Mino's leadership style and his management of the budget.

At oral argument before this Court, plaintiffs withdrew various claims. See majority opinion, p 67 n 6. The majority opinion addresses these withdrawn claims, in subsections IV(A), and in the portions of subsection IV(C) addressing Peacock's letter regarding the union contract. Because I would not address these withdrawn claims, I do not join in those portions of the majority opinion.

Plaintiffs' remaining claims were properly dismissed.